IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT KNOXVILLE
Assigned on Briefs October 11, 2017

**STATE OF TENNESSEE v. DAVID WAY**

**Appeal from the Circuit Court for Sevier County**
**No. SR-19267-II     Richard R. Vance, Judge**

_____

**No. E2016-02289-CCA-R3-CD**

_____

The Defendant-Appellant, David Way, appeals from his Sevier County jury convictions of burglary, theft over $1,000, vandalism over $1,000, and possession of burglary tools. As a career offender, he received an effective sentence of thirty-six years in confinement. The sole issues presented for our review are whether the trial court erred in denying Way's motion to suppress certain evidence due to the State's failure to establish a proper chain of custody and whether the evidence is sufficient to support each of his convictions. Upon our review, we affirm the judgments of the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Circuit Court Affirmed**

CAMILLE R. MCMULLEN, J., delivered the opinion of the court, in which JAMES CURWOOD WITT, JR., and ROBERT L. HOLLOWAY, JR., JJ., joined.

Jessica S. Sisk, Newport, Tennessee, for the appellant, David Louis Way.

Herbert H. Slatery III, Attorney General and Reporter; Renee W. Turner, Senior Counsel; Jimmy B. Dunn, District Attorney General; and Nicholas Spangler, Assistant District Attorney General, for the appellee, State of Tennessee.

**OPINION**

In the early morning hours of August 19, 2012, police responded to a burglary alarm at Gatlinburg-Pittman High School (GPHS). As part of their investigation, officers viewed video surveillance which showed two masked individuals dressed in camouflage clothing entering the school at approximately 2:30 a.m., carrying crow bars, chisels, and hammers. One of the individuals depicted in the video walked with a distinctive gait or "heel kick," which was later determined to be consistent with how Millard Spurgeon, Way's co-defendant, walked. The video further showed one of the individuals using the tools to pry open the automatic teller machine (ATM) inside the school, from which more

than $1,000 was stolen. Vending machines at the school were also damaged. On the same day of the school burglary, Way and his co-defendant were at a local store near the school wearing similar clothes to those worn by the perpetrators and spending a large amount of money. The store clerk notified the police, and Way eventually consented to a search of his vehicle. Tools recovered from Way's vehicle were examined by the Tennessee Bureau of Investigation (TBI) and determined to be consistent with tools that created the marks on the ATM. Paint found on the tools was found to be consistent with the paint found on the ATM. Way and his co-defendant were subsequently charged with the instant offenses, and the following proceedings occurred prior to trial.

**Motion to Suppress.** At the December 14, 2015 suppression hearing, Way sought to exclude parts of the ATM and all of the tools recovered from his car based on the State's deficient chain of custody. Defense counsel argued generally that "there [were] substantial gaps, days, and sometimes months, that [went] by [and] there is no chain of custody as far as like dates when things were retrieved and submitted back into evidence." In response, the prosecutor explained that the officer who initially recovered the evidence from the scene and from the school took it to his office at the police department, locked it, and then went out of town. Within a few days, another officer logged the evidence and transported it to the crime lab. The State maintained that there was no break in the chain of custody.[1] The State then provided the following testimony.

Gatlinburg Police Detective Gary McCarter testified that he was called to the GPHS burglary scene on the morning of August 19, 2012. Around 12:00 p.m. that same day, he responded to McKinney's Market where Way and his co-defendant, Spurgeon, were on the scene in Way's vehicle. Detective McCarter testified that Way consented to a search of his vehicle from which he recovered various tools and clothing. Detective McCarter identified exhibits 1 through 8 as pictures he took of the tools, gloves, and clothing he retrieved from Way's vehicle.[2] He testified that he took these pictures as soon as he returned to the police station that afternoon around 2:00 p.m. He specifically noted the timestamps of exhibit 1 at 2:10 p.m. and exhibit 5 at 2:11 p.m. Detective McCarter also identified exhibit 9 as a picture taken at McKinney's Market to show what

---

[1] The State urged the trial court to dismiss the motion to suppress based on its prior ruling in State v. David Way, No. E2014-01246-CCA-R3-CD, 2015 WL 3991046 (Tenn. Crim. App. July 1, 2015). In that case, the trial court revoked Way's previously unrelated community corrections sentence based on the facts of the instant offense. However, the chain of custody issue was not raised by Way during his revocation hearing or addressed on appeal as argued by the State at the suppression motion.

[2] The record on appeal notes that the exhibits are located in the co-defendant's record, which was not consolidated for purposes of appeal. By order on February 21, 2017, this court granted Way's motion to take judicial notice of the exhibits in his co-defendant's case.

was taken as evidence and noted its timestamp of 12:50 p.m. He then identified exhibit 10 as a picture taken of the tool box inside Way's vehicle.

After Detective McCarter retrieved the clothing and tools from Way's vehicle, he placed everything into his police car and went immediately to the police station. He then photographed and locked the evidence in his office. Detective McCarter had a telephone conversation with Way and Way's mother during which Way requested the tools be returned. Detective McCarter went on vacation the next day. Detective McCarter stated that he next saw the tools the week of the suppression hearing, and that they were the same tools he retrieved from Way's vehicle on August 19, 2012.

On cross-examination, Detective McCarter testified that he did not recall wearing gloves when he recovered the evidence at McKinney's Market. He explained that he took the entire tool box from Way's vehicle but did not place each item in a separate evidence bag. Detective McCarter testified that there was oil in the tool box, but that he did not do anything to clean the tools or remove the oil. He testified that he then returned to his office with the tools and created a property log of the tools and clothing retrieved, which he identified as exhibit 11. Detective McCarter called Detective Burns the evening of the burglary to take over the case while he was out of town. Defense counsel then played a portion of Detective McCarter's phone call with Way, admitted as exhibit 12, during which Detective McCarter apparently said that he was not aware that Detective Burns went into his office.

Gatlinburg Police Detective Rodney Burns testified that on August 20, 2012, he was directed by the police chief to assist in the investigation of the GPHS burglary. That morning, he went to GPHS, photographed the ATM, and removed the ATM door and inner housing. Detective Burns testified that the scene at GPHS was covered and sealed with crime scene tape. He explained that he used a crescent wrench to unbolt the ATM from the floor and took it to the Gatlinburg Police Department (GPD), where it was wrapped and locked in his office. The next day, August 21, 2012, he entered them into the GPD evidence locker. The same day, Detective Burns retrieved the tools from Detective McCarter's office with the police chief's permission and key. He identified exhibits 1 through 10 as the clothing, tools, gloves, and tool box that had been locked in Detective McCarter's office. Detective Burns then provided the evidence to the evidence technician and completed the necessary paperwork.

On October 24, 2012, Detective Burns transported the evidence to the TBI. He retrieved the evidence from the TBI on February 18, 2014, and secured it at GPD. He explained that the tools were individually wrapped in thick brown paper and that the tools exhibited at the hearing were the same tools he originally took from Detective McCarter's office and submitted to TBI.

- 3 -

On cross-examination, Detective Burns testified that GPD detectives do not share keys and that, but for the police chief giving him the key to Detective McCarter's office, he would not have had access to it. Upon entering Detective McCarter's office, Detective Burns observed some of the tools inside the tool box and some were laid out on the chair and carpet. Some of the smaller tools in the bottom of the tool box had oil on them, but none of the main tools did. Detective Burns wore gloves while retrieving the evidence and wiped oil off of some of the smaller tools. He did not wipe off the pry bars. Detective Burns confirmed that he and the evidence technician individually wrapped the tools, processed them, and locked them into evidence.

Detective Burns identified exhibit 13 as the property log he made of all of the evidence retrieved from GPHS and Detective McCarter's office. Exhibit 13 is comprised of thirteen pages, the first six of which show property logs listing various tools, clothing, broken pieces of the ATM, discs, and the ATM door and casing. Each of these pages shows that the evidence was submitted by Detective Burns on August 21, 2012, at 12 p.m. The next six pages of exhibit 13 show the same logs but also provide that it was received by "J. MERICA" on August 21, 2012, at 4:03 p.m. Detective Burns then identified exhibit 14 as the TBI reports he received after the evidence was tested. Exhibit 14 is a collection of four different TBI reports including (1) an official firearms report/tool mark identification showing that the tools from Way's vehicle and pieces from the ATM were received at the Nashville lab on October 24, 2012 at 2:45 p.m.; (2) an official microanalysis report examining paint scrapings showing that the same evidence was received at the same lab on the same day and time; (3) an official latent print report showing that the Nashville lab received latent prints from GPHS on October 19, 2012, at 1:35 p.m. and known fingerprint impressions of Way and his co-defendant on February 11, 2013, at 3:47 p.m. and (4) an official serology/DNA report showing that swabs from a drink bottle were received by the Knoxville lab on October 24, 2012, at 9 a.m.

At the conclusion of the suppression hearing, the trial court denied Way's motion to suppress. In denying the motion, the trial court accredited the testimony of Detectives McCarter and Burns. It concluded that the evidence was retrieved from Way's vehicle, locked in an office, and later taken to the TBI for testing. It further determined that defense counsel failed to show that the evidence was tampered with or falsified.

**Trial**. At the joint trial on December 16, 2015, John Anthony Ogle, the principal of GPHS, testified that the school's security monitoring was triggered on Sunday, August 19, 2012. When he arrived at GPHS, the police were already present, and he found that the ATM, coin, and vending machines had been broken into and the money stolen. Through photographs admitted into evidence, Ogle identified the machines that were vandalized and burglarized, noting visible pry marks and damage to the machines. The security video from the camera system, admitted as exhibit 2, showed two masked

perpetrators dressed in dark and camouflage clothing, wearing gloves with white writing. The shorter of the two perpetrators had a distinctive "heel kick" that was present at various times throughout the security video. The video showed the perpetrators breaking into the ATM with various tools, applying force to open it and retrieve the cash cassette. On cross-examination, Ogle stated that measures were taken to prevent students from interfering with the crime scene while school was in session the next day, including placing cones and caution tape around the ATM.

Stephanie Randles, electronic banking manager at Tennessee State Bank, stated that she supervised the ATM located at GPHS. Using the bank's ATM tracking program, she determined that there was $1,540.00 in the ATM before the burglary. After inspecting the ATM and assessing its damage, she reported that no cash was recovered after the burglary and that a new ATM was purchased in the amount of $3,644 and change.

Detective Gary McCarter responded to the scene at GPHS. He identified various photos of the ATM and vending machines broken into as being in the same condition as they were when he arrived on scene. By reviewing the security video with the principal, Detective McCarter noticed the two perpetrators' dress, height, weight, mannerisms, tools, and the distinctive leg kick of one of the perpetrators. After reviewing and photographing the scene, Detective McCarter spoke with Jamilla Bird at McKinney's Market, told her about the burglary, demonstrated the distinctive leg kick, and asked her to keep an eye out. A few hours later, Bird called Detective McCarter regarding two individuals in the store matching the given description. She identified them at trial as Way and his co-defendant. When Detective McCarter returned to McKinney's Market, he found Way and Spurgeon in Way's vehicle in the parking lot. Way consented to Detective McCarter's search of his vehicle from which a tool box and wet clothes were seized. Detective McCarter went directly to the GPD, placed the evidence in his office, took photographs, and locked his office before leaving.

On cross-examination, Detective McCarter said there were no identifying characteristics visible from the security video such as hair or eye color and tattoos. Detective McCarter further explained it was not necessary to check for fingerprints or DNA because the perpetrators were completely covered. Despite finding matching tools and clothing in Way's vehicle, Detective McCarter agreed that he did not retrieve any masks, backpacks, or large sums of money.

Jamilla Bird was employed at McKinney's Market during the time of the burglary. She spoke with Detective McCarter regarding the two individuals in the security video, describing one with a lazy eye and the other with a distinctive leg kick. She confirmed

that a few hours after her conversation with Detective McCarter, she called him to return to the store after observing an individual with the distinctive leg kick.

Officer Cindy Myers responded to McKinney's Market in response to suspects possibly involved in the GPHS burglary. Officer Myers testified that she interviewed Way and Spurgeon and that both men gave statements as to their whereabouts the night before. Officer Myers identified the tools and clothing taken from the scene, which she later saw in the GPD detective office.

Rodney Burns, GPD detective and criminal investigator, became involved in this case at the request of the GPD Chief. Detective Burns reviewed the investigative report, went to GPHS, photographed and examined the scene, and retrieved the ATM. He explained that he took a crescent wrench and unbolted the ATM from the floor. Under the supervision of Detective Burns, a school maintenance worker cut off the door and pieces of the ATM with a torch. The ATM door and other pieces were admitted into evidence at trial. Photographs were also admitted into evidence showing the condition of the ATM before and after it was removed from the school. Detective Burns placed all of the evidence in his car and took it to the GPD detective room where he individually wrapped each piece of evidence and secured it in his office.

After retrieving the remaining evidence from Detective McCarter's office, Detective Burns performed a complete inventory of both sets of evidence with the help of the GPD evidence technician, Officer Jerry Merrick, and wrapped everything in construction grade paper to be preserved. Cardboard was also placed around the ATM to make it safer and easier to handle. Detective Burns ensured the tools were never allowed to contact the ATM directly and that all evidence was kept separately.

Agent Randall Nelson, a forensic scientist for the TBI, was tendered as an expert in microanalysis and trace evidence. Agent Nelson testified that after the TBI received the evidence from Detective Burns, the TBI evidence technician logged the evidence into the lab and placed everything in their vault until it was ready to be tested. Agent Nelson later requested the evidence from the evidence receiving unit and made an exchange of the evidence from the vault. He took the evidence back to his unit where he began analyzing the evidence and kept it locked in a small vault in his unit when it was not being tested. Agent Nelson opened each tool individually to determine if any paint could be collected from the tools. If there was collectable paint, he used a sterile one-time use scalpel to collect the paint and placed each sample into its own dish. Agent Nelson compared the paint taken from the known source, the ATM parts, to the unknown sources, the tools recovered from Way's vehicle, and prepared a report, admitted as exhibit 31. Based on his analysis, Agent Nelson concluded that the paint transfers from two tools, the chisel and the forked tool, exhibits 7A and 9A, was consistent with the

paint from the ATM parts, or another object with the same paint history. Agent Nelson did not find paint transfers on the other nine tools offered for examination. He repackaged each tool after his analysis and returned all evidence to the evidence receiving unit.

Agent Teri Arney, a forensic scientist for the TBI, was tendered as an expert in firearm and tool marks analysis and identification. Agent Arney testified that she received the evidence from the evidence receiving unit at TBI after Agent Nelson completed his analysis. Agent Arney analyzed the markings on the ATM door and cabinet housing to determine what type of tool created the marks, and prepared a report, admitted as exhibit 33, of her conclusions. Her process, similar to latent fingerprint analysis, involved creating a casting medium by spreading a silicon-type material over the surface of the tool mark. After it sets, an imprint is created which is analyzed by microscope and compared to test markings of the tool. Based on her comparison of the tool marks on the ATM parts with the submitted tools, Agent Arney opined that the areas of the tools examined created the marks on the ATM.

Lieutenant James Breeden, supervisor of the detective division of the Sevier County Sheriff's Office, was called to investigate an escape at Sevier County Jail in January of 2015. Lieutenant Breeden testified that two inmates, including David Way, escaped from the jail and were later apprehended outside the jail while wearing street clothes.

Way's mother, Ann Way, testified that Way was at her home during the GPHS burglary. She said that Way came home around 8:00 p.m. on Saturday, August 18, 2012, went to bed early because he was sick, and did not leave until around 8:00 a.m. on Sunday, August 19, 2012. She was certain Way was at home because neither her motion-activated alarm nor her guard dog reacted to any activity that night.

Officer Robert Cantley, the evidence custodian, maintained the evidence at GPD, including the evidence recovered from the GPHS burglary. Once the evidence is brought in, Officer Cantley catalogs it and places it into secure storage to ensure the security and preservation of the evidence until the officer requests return of the evidence.

Following the conclusion of the proof, the jury convicted Way as charged in the presentment. The trial court later sentenced Way as a career offender to twelve years each for the Class D felony burglary conviction, the Class D felony theft over $1,000 conviction, and the Class D felony vandalism over $1,000 conviction, and eleven months and twenty-nine days for the Class A misdemeanor possession of burglary tools conviction. The court ordered the twelve-year sentences to run consecutively and the eleven months and twenty-nine days sentence to run concurrently, for an effective

sentence of thirty-six years in confinement. The trial court also imposed the fines as found by the jury and ordered Way to pay restitution. It is from these judgments that Way now appeals.

## ANALYSIS

**I. Chain of Custody.** Way argues that the State did not properly establish the chain of custody. Specifically, Way contends that the integrity of the evidence was compromised due to "glaring discrepancies in the custody logs submitted into evidence" by GPD Detectives McCarter and Burns. Due to these discrepancies, Way asserts "[t]he log formulated by Detective Burns and [GPD] is falsified and calls into question the credibility of the officers purporting the authenticity and veracity of the logs." In response, the State contends, and we agree, that the chain of custody was properly established.

"The requirement of authentication or identification as a condition precedent to admissibility is satisfied by evidence sufficient to the court to support a finding by the trier of fact that the matter in question is what its proponent claims." Tenn. R. Evid. 901(a). Therefore, the question of whether tangible evidence has been properly authenticated is left to the discretion of the trial court. State v. Cannon, 254 S.W.3d 287, 295 (Tenn. 2008) (citing State v. Scott, 33 S.W.3d 746, 752 (Tenn. 2000); State v. Beech, 744 S.W.2d 585, 587 (Tenn. Crim. App. 1987)). The trial court's determination will not be disturbed in the absence of a clearly mistaken exercise of such discretion. State v. Holbrooks, 983 S.W.2d 697, 701 (Tenn. Crim. App. 1998) (citing Beech, 744 S.W.2d at 587). This court will not reverse unless the "'court applied an incorrect legal standard, or reached a decision which is against logic or reasoning that caused an injustice to the party complaining.'" State v. Shirley, 6 S.W.3d 243, 247 (Tenn. 1999) (quoting State v. Shuck, 953 S.W.2d 662, 669 (Tenn. 1997)).

To admit tangible evidence, the party offering the evidence must either introduce a witness who is able to identify the evidence or must establish an unbroken chain of custody. Cannon, 254 S.W.3d at 296; Holbrooks, 983 S.W.2d at 700 (citing State v. Goodman, 643 S.W.2d 375, 381 (Tenn. Crim. App. 1982)). This rule ensures that "'there has been no tampering, loss, substitution, or mistake with respect to the evidence.'" Scott, 33 S.W.3d at 760 (quoting State v. Braden, 867 S.W.2d 750, 759 (Tenn. Crim. App. 1993)). However, absolute certainty of identification is not required. See State v. Kirkpatrick, 52 S.W.3d 81, 87 (Tenn. Crim. App. 2000) (citing Ritter v. State, 462 S.W.2d 247, 250 (Tenn. Crim. App. 1970)). In addition, an item may be admitted even if the State fails to call each witness who handled the item. Cannon, 254 S.W.3d at 296 (citing State v. Johnson, 673 S.W.2d 877, 881 (Tenn. Crim. App. 1984)). "Reasonable assurance, rather than absolute assurance, is the prerequisite for admission." Kirkpatrick, 52 S.W.3d at 87. "[W]hen the facts and circumstances that surround tangible evidence

reasonably establish the identity and integrity of the evidence, the trial court should admit the item into evidence." Id. at 296.

In his brief, Way makes several sweeping assertions challenging the chain of custody, none of which are supported by the record. The thrust of his argument is that the evidence recovered from GPHS, the ATM door and inner cabinet, was contaminated because it was unattended from Sunday, after the initial discovery, to Monday, before it was retrieved by Detective Burns. The record shows that the burglary occurred early Sunday morning when the school was closed, and "the only people that had access to the building [following the alarm] were officers of GPD and [the principal]." The following Monday morning, the principal and school janitor cleaned debris away from the scene. The ATM, secured by caution tape and cones, was unbolted from the floor and recovered by Detective Burns that same morning. It was taken outside where parts of the ATM door and inner cabinet were removed with a torch. Detective Burns returned these items to GPD, wrapped each item individually to prevent cross-contamination, and stored them in the evidence locker room. Based on this record, we are not convinced that the paint or tool markings on the ATM were somehow contaminated between Sunday and Monday such that it compromised the chain of custody.

Next, Way points to inconsistent dates submitted on property logs to discredit Detective Burns and undermine his testimony supporting the chain of custody. Relying on exhibits 11, 13, and 14 from the suppression hearing, Way claims that "logs formulated by [GPD] reflect[] that the same evidence was checked into the [GPD] by Detective Burns on November 6, 2012." Because TBI had not completed its examination of the evidence until after November 6, Way claims the property logs created by Detective Burns were false. We have reviewed the exhibits, none of which show a November 6, 2012 date or in any way support Way's claim. Here, the proof at the motion to suppress and at trial established that Detective McCarter observed and photographed the vandalized ATM and vending machines at GPHS on August 19, 2012. Later that morning, at McKinney's Market, he searched Way's vehicle and found clothing and tools matching those in the security video. He retrieved the tools and clothing, placed them into his police car, and went directly to his GPD office. He then placed the evidence in his office, took photographs of the evidence, and created an informal log of each item. Detective McCarter locked the evidence in his office until it was retrieved by Detective Burns. At trial, Detective McCarter identified photographs of the parts of the ATM and vending machines, clothing, and tools as being in the same condition as they were when initially recovered. Additionally, Way did not dispute ownership of the tools recovered from his vehicle and wanted them returned.

Upon arriving at GPHS on August 20, 2012, Detective Burns photographed the scene and collected the ATM and other materials as evidence. He then placed everything

into his police car and returned directly to his office. He retrieved the remaining evidence from Detective McCarter's office, officially inventoried it, and wrapped each item individually for further testing. Detective Burns then placed all of the evidence in the GPD evidence locker, where it remained until he delivered it to the TBI on October 24, 2012. The TBI completed its firearms report on May 10, 2013, and its microanalysis report on July 15, 2013. Detective Burns retrieved the evidence and returned it directly to the GPD evidence locker room. Detective Burns identified the ATM parts, clothing, and tools at trial as being in the same condition as they were when he initially collected them.

Because the facts and circumstances surrounding the evidence reasonably established its identity and integrity, we agree with the trial court and conclude that the chain of custody was properly established.

**II. Sufficiency of the Evidence.** Way argues the evidence is insufficient to sustain his convictions for burglary, theft over $1,000, vandalism over $1,000, and possession of burglary tools. The State argues, and we agree, that the evidence is sufficient to support each of Way's convictions.

"Because a verdict of guilt removes the presumption of innocence and raises a presumption of guilt, the criminal defendant bears the burden on appeal of showing that the evidence was legally insufficient to sustain a guilty verdict." State v. Hanson, 279 S.W.3d 265, 275 (Tenn. 2009) (citing State v. Evans, 838 S.W.2d 185, 191 (Tenn. 1992)). The State, on appeal, is entitled to the strongest legitimate view of the evidence and all reasonable inferences which may be drawn from that evidence. State v. Davis, 354 S.W.3d 718, 729 (Tenn. 2011) (citing State v. Majors, 318 S.W.3d 850, 857 (Tenn. 2010)). When a defendant challenges the sufficiency of the evidence, the standard of review applied by this court is "whether, after reviewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." State v. Wagner, 382 S.W.3d 289, 297 (Tenn. 2012) (quoting Jackson v. Virginia, 443 U.S. 307, 319 (1979)). Similarly, Rule 13(e) of the Tennessee Rules of Appellate Procedure states, "Findings of guilt in criminal actions whether by the trial court or jury shall be set aside if the evidence is insufficient to support the finding by the trier of fact of guilt beyond a reasonable doubt." Guilt may be found beyond a reasonable doubt where there is direct evidence, circumstantial evidence, or a combination of the two. State v. Sutton, 166 S.W.3d 686, 691 (Tenn. 2005); State v. Hall, 976 S.W.2d 121, 140 (Tenn. 1998); State v. Matthews, 805 S.W.2d 776, 779 (Tenn. Crim. App. 1990) (citing State v. Brown, 551 S.W.2d 329, 331 (Tenn. 1977)); Farmer v. State, 343 S.W.2d 895, 897 (Tenn. 1961)).

The standard of review for sufficiency of the evidence "'is the same whether the conviction is based upon direct or circumstantial evidence.'" State v. Dorantes, 331 S.W.3d 370, 379 (Tenn. 2011) (quoting Hanson, 279 S.W.3d at 275). The jury as the trier of fact must evaluate the credibility of the witnesses, determine the weight given to witnesses' testimony, and reconcile all conflicts in the evidence. State v. Campbell, 245 S.W.3d 331, 335 (Tenn. 2008) (citing Byrge v. State, 575 S.W.2d 292, 295 (Tenn. Crim. App. 1978)). Moreover, the jury determines the weight to be given to circumstantial evidence and the inferences to be drawn from this evidence, and the extent to which the circumstances are consistent with guilt and inconsistent with innocence are questions primarily for the jury. Dorantes, 331 S.W.3d at 379 (citing State v. Rice, 184 S.W.3d 646, 662 (Tenn. 2006)). When considering the sufficiency of the evidence, this court shall not reweigh the evidence nor substitute its inferences for those drawn by the trier of fact. Id.; Wagner, 382 S.W.3d at 297 (citing State v. Bland, 958 S.W.2d 651, 659 (Tenn. 1997)).

Way was convicted of burglary, theft over $1,000, vandalism over $1,000, and possession of burglary tools. A person commits burglary if, without the effective consent of the property owner, the person enters a building other than a habitation not open to the public, with the intent to commit a felony, theft or assault. T.C.A. § 39-14-402(a)(1). A person commits theft of property if, with the intent to deprive the owner of property, the person knowingly obtains or exercises control over the property without the owner's effective consent. T.C.A. § 39-14-403(a). A person commits vandalism if the person knowingly causes damage to or the destruction of any real or personal property of another knowing that the person does not have the owner's effective consent. T.C.A. § 39-14-408(b)(1). A person commits possession of burglary tools if the person possesses any tool, machine, or implement with the intent to use the same, or allow the same to be used, to commit any burglary. T.C.A. § 39-14-701.

Way does not dispute that a burglary occurred at GPHS on or about August 19, 2012, during which money was stolen from an ATM and vending machines were vandalized. Instead, Way argues that the State failed to establish his identity as the perpetrator of the crime. Mere hours after the burglary, Way and his co-defendant, who walked with a distinctive gait, were at McKinney's Market, located nearby the school. After Way consented to a search of his vehicle, Detective McCarter recovered various tools, clothing, and gloves. The clothes found in Way's vehicle matched those worn by the masked perpetrators captured in GPHS video surveillance. Way admitted ownership of the tools and wanted them returned. The tools were later examined by the TBI and found to contain paint scrapings consistent with the paint of the ATM from GPHS. Further examination revealed that the tools created some of the markings found on the ATM. Viewed in the light most favorable to the State, we conclude that the above

evidence is sufficient to establish Way's identity as the perpetrator of the GPHS burglary. He is not entitled to relief.

## **CONCLUSION**

We conclude that the trial court properly denied Way's motion to suppress and that the evidence is sufficient to sustain Way's convictions for burglary, theft over $1,000, vandalism over $1,000, and possession of burglary tools. The judgments of the trial court are affirmed.

_____
CAMILLE R. MCMULLEN, JUDGE